UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JANE DOE,

                                 **Plaintiff,**

                **-against-**

JOHN ROE,

                                **Defendant.**
-----------------------------------------------------------------------X

Civil Action No:  17-cv-6029

**COMPLAINT**

*Trial by Jury Demanded*

      **PLAINTIFF JANE DOE** (hereinafter referred to as "Plaintiff"), by her attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

## THE PARTIES

    1.     At all times relevant to this Complaint, Plaintiff was and is a female citizen of the United States who resides in the State of Connecticut.

    2.     Upon information and belief, at all times relevant to this Complaint, Defendant John Roe (hereinafter "Defendant") was and is a male citizen of the United States who resides in Westchester County, in the State of New York.

## JURISDICTION AND VENUE

    3.     This Court has jurisdiction over Plaintiff's claim(s) based on 28 U.S.C. § 1332 because Plaintiff is a resident and domiciliary of the State of Connecticut and Defendant is a resident and domiciliary of the State of New York.  Further, Plaintiff has been damaged in an

amount to be determined at trial but in no case less than $75,000.00, exclusive of attorneys' fees, costs, and expenses.

4.      Venue is proper in this case pursuant to 28 U.S.C § 1391(1) because Defendant resides in Westchester County, New York which is in the Southern District of New York.

## OPERATIVE FACTS

### Plaintiff Enrolls at Hobart and William Smith Colleges

5.      In or around the Fall of 2016, Plaintiff enrolled at Hobart and William Smith Colleges ("HWS") as a freshman student at Williams Smith College. During her freshman year, Plaintiff was assigned to live, and in fact did reside, in HWS' Hirshson residence hall on the HWS campus.

6.      Early on in her first semester, Plaintiff established herself as a hardworking student and quickly became a part of the HWS community.

7.      Plaintiff immediately felt at home and looked forward to continuing her education at HWS.

### The Night of October 29, 2016

8.      During her first semester at HWS, Plaintiff decided to celebrate Halloween with her then roommate, C.F. ("Roommate C.F."). As part of the celebration, Plaintiff dressed in a 70's hippie costume and Roommate C.F. dressed in a cruise director costume.

9.      Plaintiff was excited to go out with her friends and celebrate the Halloween holiday. Unfortunately, Plaintiff's night did not go according to plan.

## I.   Plaintiff and Roommate C.F. Prepare to Go Out and Celebrate Halloween

10.    On the evening of October 29, 2016, Plaintiff and Roommate C.F. went to dinner and decided to hang out in their dorm room prior to going out to celebrate Halloween.

11.    While in her dorm room, Plaintiff did not consume any alcohol. However, prior to leaving their dorm room, Plaintiff and Roommate C.F. decided to fill a standard 16.9-ounce water bottle approximately three-fourths (¾) full with straight vodka, upon information and belief, Svedka Vodka. The ladies intended to take shots of the vodka from the water bottle throughout the night.

12.    At approximately 9:30 p.m., Plaintiff and Roommate C.F. left their dorm room, vodka filled water bottle in hand, and began to walk to the PSK house, the residence of one of HWS' fraternities.

13.    Upon information and belief, the PSK fraternity was hosting a Halloween party which Roommate C.F. had been invited to and which Roommate C.F. was bringing Plaintiff along to as her 'plus one.'

14.    During the walk to the PSK fraternity house, Plaintiff and Roommate C.F. began to share the vodka filled water bottle and took turns taking shots of vodka from the water bottle.

## II.   Plaintiff's Halloween Celebration Begins at the PSK Fraternity House

15.    At approximately 9:45 p.m., Plaintiff and Roommate C.F. arrived at the PSK fraternity house. By the time they arrived at the PSK fraternity house, Plaintiff and Roommate C.F. had consumed approximately one-third (1/3) of the vodka filled water bottle. The girls continued to take shots of vodka out of the water bottle while at the PSK fraternity house.

16.    When there were approximately two (2) shots left in the water bottle, Roommate C.F. told Plaintiff that she did not want anymore and Plaintiff thereafter finished the remainder

of the vodka in the water bottle by herself. The entire water bottle of vodka was empty within the first fifteen (15) minutes of arriving at the PSK fraternity house.

17.     Upon information and belief, Plaintiff consumed, at a minimum, four (4) shots[1] of straight vodka within a half hour time period.

18.     While at the PSK fraternity house and after finishing the vodka filled water bottle, Plaintiff socialized with her friends and continued to drink approximately two (2) twelve-ounce cans of beer. Plaintiff consumed the vodka and beer, upon information and belief, within one hour.

19.     Upon information and belief, as Plaintiff continued to drink and socialize at the PSK fraternity house, she slowly began to feel the effects of her alcohol consumption and, at one point, became nauseous.

20.     Plaintiff and Roommate C.F. remained together while at the PSK fraternity house and, after approximately one hour, decided to leave the PSK fraternity house to search for an alternative Halloween party. Plaintiff and Roommate C.F. left the PSK fraternity house at approximately 11:00 p.m. with the intention of going downtown to a local restaurant, Beef & Brew.

21.     Upon information and belief, Beef & Brew was a popular local restaurant where many of Plaintiff's fellow freshmen students liked to socialize. Upon information and belief, many students Plaintiff knew were at Beef & Brew the night of October 29, 2016.

---

[1] The average shot of alcohol is 1.5 fluid ounces. As indicated earlier, the water bottle was filled ¾ full with vodka, i.e. was filled with approximately 12.7 ounces of vodka equaling approximately 8.5 shots of vodka. Plaintiff estimates that she consumed, at a minimum, one half of the vodka in the water bottle amounting to approximately four (4) shots of vodka.

### III.   Plaintiff Begins to Feel the Effects of her Alcohol Consumption

22.   After leaving the PSK fraternity house, Plaintiff walked with Roommate C.F. to go to Beef & Brew. While Plaintiff and Roommate C.F. were initially part of a larger group, during their walk Roommate C.F. became ill and broke away from the group. Plaintiff followed to care for her friend and, as a consequence, lost the group she was initially walking with.

23.   While Plaintiff cared for Roommate C.F., who upon information and belief, had become sick due to her alcohol consumption, Plaintiff began to significantly experience the negative effects of her alcohol consumption.

24.   Specifically, as indicated above, Plaintiff, a young and petite lady, had consumed, at a minimum, four (4) shots of vodka and two (2) 12-ounce cans of beer within an hour timeframe. Furthermore, while Plaintiff had consumed a meal prior to leaving her dorm, a significant amount of time, upon information and belief approximately three and one-half hours, had elapsed between her last meal and when she commenced taking shots from the water bottle.

25.   Moreover, Plaintiff did not have much experience drinking alcohol prior to her freshman year at HWS and, accordingly, had not built up any sort of tolerance to alcohol prior to the night of October 29, 2016.

26.   As a result of the foregoing circumstances, Plaintiff was suddenly and significantly affected by the volume and pace of her alcohol consumption on the night of October 29, 2016.

27.   Specifically, Plaintiff herself began to feel sick while she cared for Roommate C.F., experienced dizzy spells, nausea, and feelings of not being in control of her thoughts or physical actions. Plaintiff continued to feel drunker and drunker as the night went on.

**IV.**    **Plaintiff and Roommate C.F. Continue on to the Soccer House**

28.    After Roommate C.F. no longer felt ill, she suggested that the ladies go to the Soccer House. Upon information and belief, Roommate C.F. suggested they go to the Soccer House because her boyfriend lived there and Roommate C.F. wanted to meet up with him.

29.    Although Plaintiff was already extremely inebriated at the time and did not want to go to the Soccer House, Plaintiff agreed to go because she did not feel safe separating from Roommate C.F. in her impaired condition.

**V.**    **Plaintiff Meets Defendant for the
First Time and is Immediately Assaulted by Defendant**

30.    By the time Plaintiff and Roommate C.F. arrived at the Soccer House, the effects of Plaintiff's alcohol consumption were in full force – Plaintiff was suddenly and severely affected by the level of alcohol she had consumed and was in little to no control of herself or her surroundings.

31.    When Plaintiff and Roommate C.F. arrived at the Soccer House, Plaintiff proceeded to enter the Soccer House. Although Plaintiff believed Roommate C.F. had followed her inside, in reality Roommate C.F. had remained outside the residence to speak with her boyfriend, leaving Plaintiff alone and vulnerable in her impaired state.

32.    Plaintiff scanned the Soccer House for any sign of someone she knew. While doing so, Plaintiff saw a then unknown man, Defendant, attempting to dance with a group of girls. Plaintiff was entirely uninterested in Defendant and did not pay much attention to him, as she did not know nor had ever seen him before.

33.    Despite her indifference towards him, Defendant made eye contact with Plaintiff and began to walk in her direction.

34.     When Defendant reached Plaintiff, he immediately grabbed onto Plaintiff and began kissing her.

35.     Plaintiff was shocked as she had never before met nor seen Defendant, and certainly did not expect to be forced to kiss him without any prior conversation or, more importantly, her prior consent.

**VI.     Defendant Lures Plaintiff to His Bedroom Under False Pretenses**

36.     After Defendant forced Plaintiff to kiss him at the Soccer House, he made several attempts to coerce Plaintiff to accompany him to his bedroom. Specifically, Defendant trapped Plaintiff at the Soccer House and repeatedly asked her to go back to his room with him. Plaintiff repeatedly told Defendant "No."

37.     Plaintiff pleaded with Defendant to go downtown. Specifically, Plaintiff wanted to go to Beef and Brew, as she and Roommate C.F. had initially planned.

38.     Plaintiff, having just been forced to kiss a stranger and still unable to locate Roommate C.F., believed that she would be able to find some of her friends at Beef and Brew, and determined that her safest option was to go somewhere where she was likely to be surrounded by people she knew and trusted.

39.     Plaintiff repeatedly told Defendant that she wanted to go to Beef and Brew but Defendant refused to allow her to leave and go to the restaurant. Finally, Defendant told Plaintiff that he would bring her to Beef and Brew after they made a quick stop to his room.

40.     In her impaired state, Plaintiff believed Defendant to mean that the pair would briefly drop by his dorm room, likely to retrieve something such as Defendant's wallet, and then immediately proceed to Beef and Brew.

41.     Although Plaintiff did not want to spend any additional time with Defendant, in her severely impaired state she understood that she was unable to get to Beef and Brew safely on her own and believed that accompanied by Defendant was the only way she would safely reach Beef and Brew and her friends.

42.     Plaintiff agreed to quickly stop by Defendant's room and then go to Beef and Brew. Plaintiff only agreed to do so because she felt trapped and as though she did not have any other option or way to get to her friends and the people she trusted.

43.     As soon as Plaintiff agreed to allow Defendant to bring her to Beef and Brew, Defendant grabbed Plaintiff by the hand and led her out of the Soccer House.

44.     Throughout her initial interaction with Defendant, Plaintiff continued to feel the effects of her alcohol consumption, which strongly affected her senses and ability to process her surroundings. As evidence of her impaired state, Plaintiff sent several text messages and made a number of phone calls throughout the night to several of her friends informing them that she was very drunk and calling out for help.

45.     Upon information and belief, Defendant had no intention of just stopping briefly by his room, nor did he intend to safely transport Plaintiff downtown to Beef and Brew where she could find people she knew and trusted.

46.     Rather, upon information and belief, Defendant took account of Plaintiff's drunken state and used it to his advantage to trick and coerce Plaintiff into agreeing to accompany him to his room.

47.     Defendant knowingly and willfully manipulated Plaintiff's impaired state of mind with the intent and desire to take advantage of Plaintiff. Defendant knew, or should have known,

that Plaintiff was unable to make informed decisions in her drunken state of mind and chose to not only ignore her incapacitated state, but to manipulate it to suit his own desires.

48.     In her drunken state, Plaintiff was unable to keep up, and upon information and belief, stumbled while attempting to walk with Defendant due to her alcohol consumption. Defendant, upon information and belief, sensing Plaintiff's inability to keep up with him, locked arms with Plaintiff and forcefully pulled Plaintiff from the Soccer House to his room.

49.     Plaintiff recalls very little from the walk from the Soccer House to Defendant's room, as the effects of her alcohol consumption began to significantly distort her senses. Plaintiff felt incredibly confused and unable to process her surroundings as Defendant shepherded her back to his room.

50.     Plaintiff was visibly intoxicated as she was unable to support herself and required assistance from Defendant to walk any distance. Upon information and belief, Defendant noticed and understood that Plaintiff was intoxicated, and took advantage of Plaintiff's vulnerable and susceptible state of mind.

### VII.     Defendant Rapes Plaintiff (the "Assault") and Shames Her for the Sexual Assault

51.     Plaintiff and Defendant then arrived at Defendant's dorm room which, upon information and belief, was located in HWS' O'Dells building. Once Defendant and Plaintiff reached Defendant's room, Defendant walked into his bedroom and Plaintiff, expecting that they were only briefly stopping by, stood in the doorway attempting to take in her surroundings and regain her composure.

52.     However, despite having led Plaintiff to believe they would only stop quickly by his room before he brought her to Beef and Brew, Defendant quickly revealed his true intentions.

53.     Upon entering his room, Defendant, without addressing Plaintiff at all, removed all of his clothing and put on a condom.

54.     Upon seeing Defendant, Plaintiff became increasingly confused and scared as she never meant, suspected, nor wanted to engage in any sort of sexual conduct with Defendant.

55.     Plaintiff remained clothed standing in Defendant's doorway.

56.     Upon information and belief, as a result of the amount of alcohol Plaintiff had consumed that night, coupled with the short time frame in which said alcohol was consumed and Plaintiff's small stature, Plaintiff blacked out from being too drunk.

57.     The next thing Plaintiff knew, she was naked on her back on Defendant's bed with Defendant on top of her. Defendant had vaginally penetrated Plaintiff with his penis and was having sex with Plaintiff. Plaintiff did not recall how her clothes were removed or how she ended up on Defendant's bed.

58.     Plaintiff recalls regaining consciousness and realizing what was happening to her. Plaintiff was bewildered as at no point throughout that night did she, in any way, manifest her consent to engage in any sexual act with Defendant.

59.     Plaintiff was so shocked and scared at what was happening to her, she felt paralyzed - unable to move her limbs, which felt heavy and limp - and unable to stop what Defendant was doing to her.

60.     Plaintiff remained stock-still and silent as Defendant continued to vaginally penetrate her without Plaintiff's either implied or explicit consent.

61.     At some point, Plaintiff felt Defendant withdraw and it appeared as though he were attempting to remove the condom he had earlier put on. At this point, sensing that this was her chance to escape, Plaintiff felt a jolt of adrenaline, sat up, and told Defendant "No, No."

62.     Instead of listening to Plaintiff's clear manifestation of her non-consent, Defendant placed the condom back onto his penis and once again vaginally entered Plaintiff.

63.     At this point, Plaintiff began to fear for her life and did not know what Defendant would or could do to her. Plaintiff had already told Defendant "No" and Defendant clearly dismissed her rejection and continued to rape Plaintiff.

64.     At some point, Defendant again withdrew from Plaintiff and attempted to remove the condom. Plaintiff re-iterated "No" to Defendant but Defendant showed no signs of stopping.

65.     Plaintiff, realizing that she was in danger and not knowing what Defendant was capable of doing to her, believed that the only safe way out of her situation was if Defendant got what he wanted – i.e. he was able to ejaculate.

66.     Plaintiff knew that what was happening was wrong and wanted to escape from Defendant's room as quickly and safely as possible.

67.     Believing that it was her safest option, and in fact the only way to end this horrible experience quickly and without further physical trauma, Plaintiff performed oral sex on Defendant in order to make him ejaculate. Defendant ejaculated in Plaintiff's mouth.

68.     As soon as Defendant ejaculated, Plaintiff, as quickly as she could in her still drunken state, shot up from Defendant's bed and searched for her clothes. While Plaintiff was searching for her clothing and attempting to quickly dress herself, Defendant snidely asked Plaintiff "Do you even know my name?" This was the first time Plaintiff recalls Defendant ever saying anything to her after they reached his room at O'Dells.

69.     Plaintiff truthfully replied that she did not know Defendant's name.

70.     In response, Defendant appeared disgusted and said "HOW DO YOU NOT KNOW **MY** NAME?"

71.     Plaintiff felt embarrassed as though she was somehow guilty of not knowing who her attacker was. Defendant, after already stripping Plaintiff of her dignity by sexually assaulting her, added salt to the wound by shaming Plaintiff for their non-consensual sexual encounter and making Plaintiff feel as though she was somehow at fault for the Assault.

72.     Plaintiff felt "slut-shamed," a term colloquially used to describe the feeling of embarrassment and shame caused by others' comments or opinions following a sexual encounter.

73.     Plaintiff continued to search for her clothes and get re-dressed. Upon information and belief, while Plaintiff was distracted getting re-dressed, Defendant added his contact information to Plaintiff's phone.

74.     While Plaintiff was getting dressed, she heard a knock at the door. When Defendant answered the door, Plaintiff saw two girls she did not recognize who told Defendant that they had brought his friend, who was apparently very drunk, back to his room and asked Defendant to look after him.

75.     Plaintiff stood there silently as the girls spoke with Defendant. As soon as the girls left, Plaintiff went to leave Defendant's room. Before she was able to leave, Defendant stopped her and told Plaintiff "Okay, now go back to your room and don't hook up with anyone else tonight."

76.     Plaintiff was confused by this statement as she and Defendant had not "hooked up." Rather, Defendant had raped Plaintiff and, in Plaintiff's opinion, was continuing to exert his power over her by making demands of her even after she left his room.

**Plaintiff is Left in Turmoil**

77.    Following the Assault, Plaintiff was left extremely confused and in utter disbelief. Plaintiff could not fathom what had just happened to her and tried to bottle up her emotions, which only proved more harmful.

78.    On her walk back to her room at Hirshson, Plaintiff called Roommate C.F. and, upon arriving at Hirshson, went straight to her friend G.R's ("Friend G.R.") room. Plaintiff was still attempting to process the Assault and did not want to be alone.

79.    Upon waking up on October 30, 2016, Plaintiff was overtaken with fear about the Assault and scared that Defendant had succeeded in removing the condom, an action he attempted, upon information and belief, twice during the Assault.

80.    Upon finding Defendant's contact information in her phone, Plaintiff asked him if he had used a condom which he confirmed he did. Still, Plaintiff could not trust what he was telling her and decided to take Plan B, an over the counter medication used as an emergency contraceptive.

81.    Plaintiff's friend P.D. ("Friend P.D.") drove Plaintiff and Roommate C.F. to the pharmacy to buy Plan B. On the way, Plaintiff confided in Friend P.D. that she was "taken advantage of" the night before. Plaintiff further confided what had happened to Roommate C.F. and identified Defendant as her attacker.

**Defendant Stalks Plaintiff and Physically Assaults Her a Third Time**

82.    On or about December 3, 2016, Plaintiff and her friend M.B. ("Friend M.B.") were socializing at Beef and Brew with a number of other classmates.

83.    At one point in the night, Plaintiff felt as though she was being watched. When Plaintiff looked around, she immediately saw that Defendant was also at Beef and Brew and was

standing alone and staring directly at her. Plaintiff, in an attempt to protect herself, surrounded herself with her friends and attempted to distract herself from Defendant's prying gaze.

84.     Despite being surrounded by her friends, Plaintiff continued to sense Defendant, who was only a few feet away from her and her friends, staring at her. It appeared as though Defendant intended to approach Plaintiff.

85.     Alarmed, Plaintiff immediately excused herself into another room at Beef and Brew.

86.     Less than one minute later, Plaintiff looked up and saw Defendant had followed her into the second room at Beef and Brew and was once again standing to the side alone, just a few feet away from Plaintiff, and was staring at her. Plaintiff was immediately fearful and again excused herself to return to that first room.

87.     Still feeling uneasy, Plaintiff checked to see if Defendant had again followed her from room to room. As he had just done before, Defendant stalked Plaintiff back into the first room and was still standing alone, staring at her.

88.     Before Plaintiff was able to notice or comprehend what was about to happen, Defendant was suddenly against Plaintiff. Although there were multiple paths to take throughout the room, Defendant intentionally walked in Plaintiff's direction and, upon reaching her, slid behind her and rubbed his genital area against Plaintiff's buttocks.

89.     Once again, Plaintiff, in her mind, was transported back to the night of the Assault and immediately felt sickened.

90.     Plaintiff raced outside of Beef and Brew to an outdoor area of the restaurant, and burst into tears. Friend M.B. followed Plaintiff outside and tried to calm Plaintiff down. Friend M.B. was eventually able to coax Plaintiff to go back inside Beef and Brew.

91.     Once back inside, however, Plaintiff could still sense Defendant staring at her and at one point, saw Defendant again intentionally moving towards her.

92.     Defendant attempted to cut through Plaintiff's friends to reach Plaintiff. Upon seeing this, Plaintiff grabbed Friend M.B. and left as quickly as she could.

93.     Plaintiff, feeling great discomfort, left Beef and Brew so as not to have to encounter Defendant again.

**Plaintiff Is Forced to Leave HWS**

94.     As a direct and foreseeable result of the Assault, Plaintiff found it increasingly more difficult to be on HWS' campus for fear of ever running into Defendant again.

95.     Plaintiff was made to feel ashamed of what had happened to her, and felt absolutely helpless as she remained on campus knowing that she had been sexually assaulted and seemingly no one at her college cared to support or help her through this trying time. Meanwhile, Defendant was able to continue living on campus and attending HWS, seemingly without withstanding any consequences.

96.     Accordingly, Plaintiff found it impossible to continue attending HWS, and was forced to leave.

97.     As a direct and proximate result of Defendant's heinous and unlawful actions, Plaintiff has suffered significant emotional injuries. Plaintiff has been traumatized, deprived of happiness and a feeling of security, and suffers daily from feelings of hopelessness, loss of confidence and security in herself, and feels an inability to move on in her life from this tragic event.

98.     Defendant intentionally sexually assaulted Plaintiff and in the process humiliated, degraded, and violated her, thereby robbing her of her dignity, and causing her severe emotional distress and lifelong damage.

99.     Defendant's actions were malicious, unjustifiable, willful, outrageous, and conducted with full knowledge of the law.

100.    As a result of Defendant's willful and unlawful actions, Plaintiff has been forever changed. Plaintiff regularly seeks treatment with a mental health professional and continues to get treatment for symptoms of post-traumatic stress disorder. Plaintiff suffers from panic attacks and high anxiety as a result of the Assault and, upon information and belief, is permanently scarred by the events of October 29, 2016.

## CAUSES OF ACTION
## AS AND FOR A FIRST CAUSE OF ACTION
*(Rape in the First Degree)*

101.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

102.    § 130.35 of the New York State Penal Law provides as follows: Rape in the first degree: A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person: (i) By forcible compulsion; or (ii) Who is incapable of consent by reason of being physically helpless; or (iii) Who is less than eleven years old; or (iv) Who is less than thirteen years old and the actor is eighteen years old or more. N.Y. CLS Penal § 130.35.

103.    § 213-c of the Civil Practice Law and Rules provides, in relevant part, as follows: Action by victim of conduct constituting certain sexual offenses: Notwithstanding any other limitation set forth in this article, a civil claim or cause of action to recover from a defendant as

hereinafter defined, for physical, psychological or other injury or condition suffered by a person as a result of acts by such defendant of rape in the first degree as defined in section 130.35 of the penal law, or criminal sexual act in the first degree as defined in section 130.50 of the penal law … may be brought within five years. As used in this section, the term "defendant" shall mean only a person who commits the acts described in this section or who, in a criminal proceeding, could be charged with criminal liability for the commission of such acts pursuant to section 20.00 of the penal law and shall not apply to any related civil claim or cause of action arising from such acts. Nothing in this section shall be construed to require that a criminal charge be brought or a criminal conviction be obtained as a condition of bringing a civil cause of action or receiving a civil judgment pursuant to this section or be construed to require that any of the rules governing a criminal proceeding be applicable to any such civil action. N.Y. CLS CPLR § 213-c.

104.     Defendant is a "defendant" as that term is defined by § 213-c of the Civil Practice Law and Rules.

105.     As set forth above, Defendant is guilty of criminal sexual conduct as defined by § 130.35 of the New York State Penal Law and is therefore civilly liable under § 213-c.

## AS AND FOR A SECOND CAUSE OF ACTION
### *(Criminal Sexual Act in the First Degree)*

106.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

107.     § 130.50 of the New York State Penal Law provides as follows: Criminal sexual act in the first degree: A person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct or anal sexual conduct with another person: (i) By forcible compulsion; or (ii) Who is incapable of consent by reason of being physically helpless; or (iii)

Who is less than eleven years old; or (iv) Who is less than thirteen years old and the actor is eighteen years old or more. N.Y. CLS Penal § 130.50.

108.    § 213-c of the Civil Practice Law and Rules provides, in relevant part, as follows: Action by victim of conduct constituting certain sexual offenses: Notwithstanding any other limitation set forth in this article, a civil claim or cause of action to recover from a defendant as hereinafter defined, for physical, psychological or other injury or condition suffered by a person as a result of acts by such defendant of rape in the first degree as defined in section 130.35 of the penal law, or criminal sexual act in the first degree as defined in section 130.50 of the penal law … may be brought within five years. As used in this section, the term "defendant" shall mean only a person who commits the acts described in this section or who, in a criminal proceeding, could be charged with criminal liability for the commission of such acts pursuant to section 20.00 of the penal law and shall not apply to any related civil claim or cause of action arising from such acts. Nothing in this section shall be construed to require that a criminal charge be brought or a criminal conviction be obtained as a condition of bringing a civil cause of action or receiving a civil judgment pursuant to this section or be construed to require that any of the rules governing a criminal proceeding be applicable to any such civil action. N.Y. CLS CPLR § 213-c.

109.    Defendant is a "defendant" as that term is defined by § 213-c of the Civil Practice Law and Rules.

110.    As set forth above, Defendant is guilty of criminal sexual conduct as defined by § 130.50 of the New York State Penal Law and is therefore civilly liable under § 213-c.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Sexual Assault and Battery)*

111.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

112.    As set forth in detail above and herein, on the night of October 29, 2016, Defendant intentionally and with the desire to cause harm, both physical and emotional, sexually assaulted Plaintiff.

113.    The sexual assault included offensive and intentional bodily contact to and/or with Plaintiff.

114.    As a result of Defendant's intentional and offensive actions during the sexual assault, Plaintiff was placed in fear for her safety.

115.    Thereafter, Defendant again intentionally engaged in offensive contact with Plaintiff's body by way of rubbing his genital area against her buttocks without Plaintiff's consent.

116.    Defendant's actions both during the Assault and thereafter placed Plaintiff in fear for her safety and in fear of a further sexual assault and/or attack on her body.

117.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A FOURTH CAUSE OF ACTION
*(Intentional Infliction of Emotional Distress)*

118.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

119.    As a direct and foreseeable consequence of Defendant's actions, Plaintiff sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

120.    The emotional distress was severe enough that it has resulted in illness and/or mental harm to Plaintiff. Plaintiff is regularly seeing a counselor and appears to be suffering

from depression, high anxiety, and post-traumatic stress disorder as a result of this experience. She was additionally forced to forfeit her level and quality of education as a result of Defendant's attack on her.

121.    Defendant's extreme and outrageous conduct was the cause of Plaintiff's distress.

122.    Considering the gravity and seriousness of Defendant's actions and the Assault on Plaintiff, Defendant knew or should have known that his conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm to Plaintiff.

123.    Plaintiff's distress is reasonable in light of Defendant's conduct.

124.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR A FIFTH CAUSE OF ACTION
*(Negligent Infliction of Emotional Distress)*

125.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

126.    As a direct and foreseeable consequence of Defendant's actions, Plaintiff sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

127.    The emotional distress was severe enough that it has resulted in illness and/or mental harm to Plaintiff. Plaintiff is regularly seeing a counselor and appears to be suffering from depression, high anxiety, and post-traumatic stress disorder as a result of this experience. She was additionally forced to forfeit her level and quality of education as a result of Defendant's attack on her.

128.    Defendant's extreme and outrageous conduct was the cause of Plaintiff's distress.

129.    Considering the gravity and seriousness of Defendant's actions and the Assault on Plaintiff, Defendant knew or should have known that his conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm to Plaintiff.

130.    Plaintiff's distress is reasonable in light of Defendant's conduct.

131.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i)    On the First Cause of Action, awarding Plaintiff compensatory and other damages in an amount to be determined at trial;

(ii)    On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial;

(iii)    On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial;

(iv)    On the Fourth Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial;

(v)    On the Fifth Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial; and

(vi)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

**Dated: New York, New York**
       **August 9, 2017**

                               **NESENOFF & MILTENBERG, LLP**
                               **Attorneys for Plaintiff Jane Doe**

                        **By:**    _/s/ Andrew Miltenberg_
                               **Andrew T. Miltenberg, Esq.**
                               **Stuart Bernstein, Esq.**
                               **Gabrielle M. Vinci, Esq.**
                               **363 Seventh Avenue, Fifth Floor**
                               **New York, New York 10001**
                               **(212) 736-4500**